EXHIBIT D

LEXSEE



Analysis
As of: Feb 26, 2008

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT
PRACTICES LITIGATION; THIS DOCUMENT RELATES TO: Alexander, et al.
v. FedEx Ground Packages Systems, Inc., Cause No. 3:05-CV-528 RM

CAUSE NO. 3:05-MD-527 RM (MDL-1700)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
INDIANA, SOUTH BEND DIVISION

2007 U.S. Dist. LEXIS 79111

October 12, 2007, Decided

**SUBSEQUENT HISTORY:** Motion to strike denied by, Class certification granted by, Request denied by In re FedEx Ground Package Sys., 2007 U.S. Dist. LEXIS 76798 (N.D. Ind., Oct. 15, 2007)

**PRIOR HISTORY:** In re FedEx Ground Package, Sys., Inc., Empl., Practices Litig., 2007 U.S. Dist. LEXIS 53327 (N.D. Ind., July 23, 2007)

**COUNSEL:** [*1] For Dean Alexander, Suzanne Andrade, Jarrett Henderson, Ely Ines, Jorge Isla, Paul Infantino, Bernard Mendoza, Jesse Padilla, Joey Rodriguez, Allan Ross, Plaintiffs: Beth A Ross, LEAD ATTORNEY, Leonard Carder LLP - SF/CA, San Francisco, CA; Hina B Shah, Lynn R Faris, LEAD ATTORNEYS, Leonard Carder LLP - Oak/CA, Oakland, CA.

For FedEx Ground Package System Inc, Defendant: David M Cialkowski, LEAD ATTORNEY, Zimmerman Reed PLLP, Minneapolis, MN; Evelyn L Becker PHV, LEAD ATTORNEY, O'Melveny & Myers LLP - Was/DC, Washington, DC.

**JUDGES:** Robert L. Miller, Jr., Chief Judge.

**OPINION BY:** Robert L. Miller, Jr.

**OPINION**

OPINION AND ORDER

This case, originally filed in the Northern District of California as that court's Cause No. 3:05-CV-38, is one of several centralized before this court pursuant to the order of the Judicial Panel on Multi-District Litigation creating MDL-1700. The common issue in the cases in the MDL docket is whether FedEx Ground drivers are employees or independent contractors. The reader's familiarity with the general arguments in this docket is presumed.

The plaintiffs in this case assert class claims for nationwide relief under the Family Medical Leave Act and for statewide relief under California law. [*2] The plaintiffs amended their complaint this week to add a claim for retaliation in violation of the Family Medical Leave Act. 29 U.S.C. § 2615. Unsurprisingly, no motion to certify a retaliation class has been filed. The matter came before this court for hearing on October 9, 2007 on the plaintiffs' motions for temporary restraining order and preliminary injunction. This opinion is intended to satisfy the requirements of Federal Rule of Civil Procedure 52. For the reasons that follow, the court denies the plaintiffs' motions.

I

On August 13, 2007, the California Court of Appeal delivered at least a partial defeat to FedEx Ground's contention that its drivers are independent contractors rather than employees. Estrada v. FedEx Ground Package Systems, Inc., 154 Cal. App. 4th 1, 64 Cal. Rptr. 3d 327 (2007). The Estrada decision affirmed a finding that FedEx Ground's SWA (single work area) contract drivers

Page 1

were employees. On September 20, 2007, FedEx Ground announced to its nationwide workforce of pickup and delivery drivers that, starting October 26, 2007, it is moving to an all-MWA (multi-work area) business model in California and will not renew the contracts of the 1,000 or so California SWA contractors. Under [*3] this "California Transition" program, no SWA contractors will remain in California by June 2008. The drivers watched a videotaped message from CEO Dave Reholz and received a pamphlet during mandatory meetings at their terminals. FedEx Ground's "California Transition" program applies equally to all California SWA contractors, without regard to whether they have been a party to any litigation.

FedEx Ground drivers operate under written contracts that set terms of one, two, or three years. Each contract contains a provision that automatically renews the contract on a year-to-year basis unless FedEx Ground or the driver prevents renewal. Historically, FedEx Ground has allowed drivers' contracts to renew automatically unless cause exists for mid-term termination of the contract. FedEx Ground didn't terminate any existing contracts; under the "California Transition" program, the contracts simply will not be renewed pursuant to the automatic renewal provision.

Also on September 20, FedEx Ground announced the availability of what it calls voluntary transition incentives for California SWA contractors. The incentives provide financial and other assistance to any SWA contractor wishing to become [*4] an MWA contractor, or to help SWA contractors who wish to leave the business and pursue other opportunities. The incentives range from $ 25,000 to just over $ 81,000, depending on the SWA contractor's annual revenues from the route. A California SWA contractor must sign a Contractor Conversion and Release Agreement to receive such payments. Section 3(a) of the Contractor Conversion and Release Agreement limits the release to claims related to the September 20 non-renewal announcement:

> Contractor . . . releases and discharge[s] . . . any and all claims . . . arising out of or in any way connected with (i) [FedEx Ground]'s announcement(s) that it is modifying its relationship with contractors in California, and (ii) any and all actions related to [FedEx Ground]'s modification of its relationship with California contractors, including, without limitation, any contemplated or actual termination, non-renewal or assignment of [Contractor's] Operating Agreement, and any contemplated or actual sale, assignment, or

other disposition of a primary service area
. . . .

Section 3(b) of the release agreement, which addresses Section 1542 of the California Civil Code, is limited to the claims defined [*5] in paragraph 3(a), which are claims related to the "California Transition." The materials FedEx Ground provided urges the drivers to contact their attorneys and includes the name and methods for contacting the putative class's counsel.

SWA contractors have until October 26, 2007 to accept or reject these offers. FedEx Ground explains that it is acting now, with this speed, because it wants to lay any uncertainty to rest before getting deeply into its peak season runs from just before Halloween through the end of the year.

FedEx Ground is free to reject any SWA contractor's efforts to become an MWA contractor. Any California SWA contractor, in turn, is free to reject the incentives and choose instead to continue operating under the existing terms of his or her Operating Agreement, though that contractor's contract will not be renewed at expiration. The materials FedEx Ground distributed to contractors explain that

> No contractor is required to sign the release of claims documents. Whatever a contractor chooses, nothing in today's announcement affects any current contract with FedEx Ground, which remains in effect. . . . In exchange for the transition incentives, FedEx Ground is asking California [*6] SWAs for a release of certain potential claims related to this transition. The release is not intended to settle all claims you may have against FedEx Ground, and is limited to potential claims concerning FedEx Ground's announcement of this transition incentive; the termination, non-renewal or assignment of the Contractor's Operating Agreement; and any sale assignment, loss or other disposition of the Contractor's primary service area.

In the "Question and Answer" section purporting to explain the decision, FedEx Ground explains:

> **Are you making these changes in light of the recent decision in the Estrada case?** We are making these changes in light of the overall regulatory and legal environment in California. While the

Estrada case is part of that environment, it is still in the appeals process, and applies to the treatment of some expenses for certain contractors in California between 1996 and 2004.

California is the only state with so significant a decision finding FedEx Ground drivers to be employees. In all other states, FedEx Ground has told its SWA contractors that it doesn't anticipate eliminating their SWA positions "at this time." At least 75% of FedEx Ground's 12,000 pickup and [*7] delivery drivers are SWA contractors. Most of the drivers know FedEx Ground's business model was challenged in California and is being challenged on a nationwide basis in this multi-district litigation docket. Which claims will be certified for class adjudication, and whether the SWA contractors and MWA contractors will be found to be employees, are questions pending before this court.

The plaintiffs say FedEx Ground's decision to terminate the California SWA contractors was meant to, and does, send a chilling message to the plaintiffs and putative class members in this MDL docket about the consequences they may face if they participate in the litigation to bring it to a successful conclusion. The plaintiffs contend this "California Transition" is a mass firing of all California SWA contractors that sends a message to all FedEx Ground drivers that their participation in, or cooperation with, this or similar lawsuits may result in unemployment. As a result, the plaintiffs say, their ability to proceed with this suit will be compromised.

The "California Transition" doesn't change the control FedEx Ground exercises over its California MWA contractors. For example, no changes are made as [*8] to how the drivers must perform or what colors they must display. FedEx Ground coupled its announcement of the mass California terminations with the offer of an unprecedented raise for the MWA workforce, called "Enhanced Primary Plus" (EPP). According to FedEx Ground, EPP is geared towards making the MWA "opportunity" more attractive with the ultimate goal of "strengthen[ing] the independent contractor model." To this end, FedEx Ground promises to pay extra annual compensation to its MWA contractors of between $ 5,000 and $ 26,000, depending on how many routes a contractor takes on.

The EPP program is mandatory for any California SWA contractor hired back as an MWA contractor. FedEx Ground promises a first EPP payment this year. EPP participants must execute an indemnification agreement; Section 2.2(f) of the Addendum requires a contractor to:

Indemnify FedEx Ground for, and hold FedEx Ground harmless from, any liability and claims by Contractor or any third party, including, but not limited to, any persons utilized by Contractor or governmental entities, arising from Contractor's use or employment of any other person(s) in the performance of Contractor's obligations, including, but [*9] not limited to, claims or liabilities arising under industrial accident prevention, workers' compensation, or similar laws or any federal, state or municipal laws applicable to the relationship between and among employers and employees.

FedEx Ground is offering "voluntary transition incentives" of $ 25,000 to $ 81,000 to those willing to execute a release of claims. FedEx Ground distributed to each California SWA contractor a release for each driver to sign. To collect the money, the SWA contractors must execute the releases and return them to FedEx Ground no later than October 26, 2007.

The plaintiffs assert that the release's language gives rise to the powerful inference that FedEx Ground intends to leave the door wide to claim--if it so chooses--that the SWA contractors who sign have waived their right to participate as class members in this MDL action. They say the release doesn't precisely state what claims it does, and does not, encompass. As the plaintiffs read it, Section 3(a) suggests that the scope of the release may be limited in some fashion to claims "related" to aspects of the "California Transition," while Section 3(b) suggests that it is intended to be a general release [*10] of all possible claims the signatory driver possesses against FedEx Ground. There is no express exclusion of the claims that have been asserted in the instant MDL actions or the earlier Estrada case. The plaintiffs also contend that the releases are being obtained through coercion: the threat of termination.

Mr. Rebholz's video message didn't mention the release. FedEx Ground indicated in the written materials that the release is limited to potential claims "concerning" various aspects of the "California Transition." In a section entitled *Important Legal Note*, in the "Question and Answer" section, FedEx Ground says:

> **"Will the release affect my ability to participate in the pending lawsuits?"**
> The release is not intended to settle all claims you may have against FedEx Ground, but is limited to potential claims

related to this transition. That said, FedEx Ground cannot advise you on your individual circumstances. Please read all documents carefully, and consult your own legal counsel.

The "Entire Agreement" clause in Section 11 states that "any representation, promise or agreement not specifically included in this agreement shall be binding upon or enforceable against either party." The [*11] plaintiffs maintain that FedEx Ground's insistence that the drivers sign this document as a condition for being paid what is essentially severance for many years of service, on very short notice, is coercive.

FedEx Ground told the California SWA contractors that they have the option to be rehired by FedEx Ground as MWA contractors. FedEx Ground has always reserved the right to approve, or deny, the application of any driver to add additional routes to his or her contract. FedEx Ground hasn't guaranteed any of the California SWA contractors that they will be approved for additional routes if they wish to be rehired in a MWA contractor status. Driver declarants have previously sought and been denied permission from FedEx Ground to "grow their business" by adding another route, or know others who were denied permission.

FedEx Ground offers incumbent MWA contractors payments of $ 15,000 for each route now operated by any California SWA contractor they can get between now and May 31, 2008; the plaintiffs see this has essentially putting all of the California routes up for sale. Thus, California SWA contractors will compete with incumbent MWA contractors, as well as with each other, to acquire [*12] routes so they can qualify as MWA contractors.

FedEx Ground requires any California SWA contractor who is allowed to acquire an additional route to participate in the EPP program and sign a new contract addendum called a "Compliance Disclosure." Mr. Rebholz's videotaped statement says that the purpose of the Compliance Disclosure Addendum is to "validate compliance with applicable laws." The twelve-page pamphlet says the same thing: "While the operating agreement has always required contractors to comply with all applicable laws and regulations, a new compliance-disclosure addendum will be required of MWAs that elect to participate in the EPP program. In this addendum, MWAs will agree to specific processes to validate compliance with applicable laws."

FedEx Ground didn't hand out the Compliance Disclosure Addendum along with the other documents distributed on September 20 when it announced the EPP.

The Compliance Disclosure Addendum requires MWA contractors to treat the others they hire to assist on their routes (e.g., as drivers or helpers) as employees for all legal purposes and to provide FedEx Ground with documentary proof that they have done so. It requires MWA contractors to indemnify [*13] FedEx Ground for claims for liability or claims brought at any time against FedEx Ground by the MWA contractor him/herself arising under federal or state employment laws, as well as claims that others might bring against FedEx Ground.

FedEx Ground also has offered the EPP program to its MWA contractors nationwide. To be paid the EPP compensation, all MWA contractors must sign the Compliance Disclosure Addendum and waive their legal claims against FedEx Ground. When the new fiscal year begins on June 1, 2008, all MWA contractors will be required to sign the Compliance Disclosure Addendum as a condition of continued employment with FedEx Ground.

Until then, existing MWA contractors in California and elsewhere are not required to accept the EPP payments or sign the Compliance Disclosure Addendum and may continue to work without penalty under their existing contracts. The materials distributed to contractors emphasize that "Enhanced Primary Plus is a voluntary program for existing Multiple Work Area contractors, not an automatic one." New MWA contractors in California entering into new contracts with FedEx Ground must sign the Compliance Disclosure Addendum.

II

To win a preliminary injunction, [*14] a party must show that it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest. If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis, which is to say the district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied.

Christian Legal Society v. Walker, 453 F.3d 853, 859 (7th Cir. 2006) (citations omitted). To satisfy the requirement of a reasonable likelihood of success on the

merits, a movant need show only a better than negligible possibility of success, Washington v. Indiana High Sch. Athletic Ass'n, 181 F.3d 840, 846 (7th Cir. 1999), and the degree of likelihood of success is reflected in the balancing of harms. Chicago Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc., 270 F.3d 1060, 1064 (7th Cir. 2001).

A.

The court's [*15] discussion begins with the assumption that the plaintiffs bring their request for a preliminary injunction under Federal Rule of Civil Procedure 23(d). Although the plaintiffs didn't cite Rule 23(d) as the basis for the relief they seek, that rule authorizes courts to regulate communications with putative class members about the litigation. See Gulf Oil Co. v. Bernard, 452 U.S. 89, 100, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981) ("Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules."); Williams v. Chartwell Fin. Servs., Ltd., 204 F.3d 748, 759 (7th Cir. 2000) ("[T]he district court was clearly concerned about the potential for abuse if the plaintiffs were allowed to contact Chartwell's customers, and expressed concern over the effect of such contacts on Chartwell's business. This is a legitimate concern, and certainly presents a potential justification for the district court's limitations on discovery. Nevertheless, a district court's discretion in this [*16] area is not unlimited. The plaintiffs have a right to contact members of the putative class, and any discovery limitations should be carefully drawn. The district court's decision as to the protective order must involve a careful balancing of the potential for abuse created by the class action and the right of the plaintiffs to contact potential class members." (citations omitted)). Courts may limit a defendant's communications with putative class members under Rule 23(d) upon a "clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." Gulf Oil Co., 425 U.S. at 101. Otherwise, a defendant's contact with putative class members generally cannot be limited. See Wiginton v. Ellis, No. 02 C 6832, 2003 U.S. Dist. LEXIS 16266, 2003 WL 22232907, at *3 (N.D. Ill. Sept. 16, 2003) (plaintiffs' assertions found to be "too speculative" to justify restrictions on communications); Jenifer v. Delaware Solid Waste Auth., Nos. Civ.A. 98-270 & 98-565, 1999 U.S. Dist. LEXIS 2542, 1999 WL 117762, at *4 (D. Del. Feb. 25, 1999) ("[A]n ongoing business relationship, such as the relationship here between DSWA and the waste haulers, can increase the possibility that the [*17] communications between litigants are coer-

cive. Where there is a relationship that is inherently coercive, the court does not need to make a finding that a particular abuse has occurred. The court, however, must still require a clear record of threatened abuses. There must be some evidence that justifies an interference with DSWA's speech." (citations omitted)).

General Motors announced the cessation of the Oldsmobile line during the pre-class certification period in Ralph Oldsmobile, Inc. v. General Motors Corp., No. 99 Civ. 4567, 2001 U.S. Dist. LEXIS 13893, 2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001). General Motors offered transition payments to its Oldsmobile dealerships (several of which would be in the putative class), but conditioned those payments on the dealerships' execution of releases that included the claims that gave rise to the class action. General Motors' communications with the dealerships about the release made no reference to the class litigation. The court found potential coercion in the relationship between General Motors and the dealerships--new Oldsmobiles were not available from other sources--and "a potential for unknowing waivers resulting from a lack of information." Id., 2001 U.S. Dist. LEXIS 13893, [WL] at *4.

The potential [*18] for coercion is similar here. Just as Oldsmobile dealerships could try to arrange to sell Toyotas, but could only get new Oldsmobiles from General Motors, the California SWA contractors might be able to become drivers for another delivery service, but can remain with FedEx Ground only by doing what FedEx Ground requires of them. But potential for coercion such as this inheres in any employment-type relationship and in a wide range of business relationships, so it cannot, standing alone, warrant the types of restriction on speech to which Gulf Oil raised the tent flaps. Adding the ingredient of payments of EPPs to contractors who might worry about the financial consequences to them of FedEx Ground's action does not add a cognizable flavor of coercion. See Fabert Motors, Inc. v. Ford Motor Co., 355 F.2d 888, 891 (7th Cir. 1966) ("Economic coercion is not established by showing that the release was given under pressure of financial circumstances under threat of Ford's having recourse to an action Ford was legally entitled to take.").

Unlike the releases General Motors demanded of the Oldsmobile dealerships, FedEx Ground's releases did not, until the amended complaint was filed earlier [*19] this week, affect the claims at issue in this case, and the releases clearly directed the drivers to class counsel for information about this case. As set forth above, Section 3(a) of the Contractor Conversion and Release Agreement (and so, by virtue of its language, Section 3(b)) is limited to claims relating to the "California Transition" program announced last month. The new Addendum required as part of the EPP provides that an MWA con-

tractor must validate his or her compliance with applicable laws and regulations by providing documentation to the company. The indemnification provision is limited to claims arising from the contractors' relationships with their employees and contains no release of claims that the contractors themselves might have against FedEx Ground. The contractors already had committed to that degree of indemnification obligation in Section 3.5(d) of the current Operating Agreement:

> 3.5 Contractor's Responsibility for Certain Losses. The following indemnities constitute an exception to the provision for risk protection to the Contractor provided in subparagraph 3.2. During the term of this Agreement and thereafter, Contractor agrees to indemnify and save FHD harmless [*20] against liabilities as follows:
>
> (d) Any or all claims brought against FHD or liabilities incurred by FHD arising from the Contractor's relationship with Contractor's employees, whether under industrial accident prevention laws, or any other federal state or municipal laws, rules, regulations and orders applicable to the relationship between employers and employees.

The plaintiffs say employee expenses are among the categories of damages they seek in this case, and the indemnification provision in the Addendum would waive any such claim by requiring the plaintiffs to repay FedEx Ground for any such expenses FedEx Ground might be required to pay the plaintiffs. The court doesn't read the Addendum as expanding any such obligation already in the current Operating Agreement.

The release appears as though it would extinguish the FMLA retaliation claims in the newly-filed amended complaint because those claims are related to the "California Transition." The Gulf Oil Court, though, discouraged limits on anything other than misleading or abusive communication. The release's omission of reference to FMLA retaliation claims can't be called misleading: if those claims exist at all, they did not exist [*21] until FedEx Ground announced the package of which the release was a part, and the claims were not filed until the day of the preliminary injunction hearing.

Of course, a communication may be abusive without being misleading, and the plaintiffs contend the existence and communication of the "California Transition" program is abusive. They contend that it conveys--and was intended to convey--the message to drivers that they can be cast aside if they oppose FedEx Ground. The plaintiffs haven't persuaded the court that FedEx Ground's communications to putative class members are abusive in the sense the Gulf Oil Court meant. Both sides agree that FedEx Ground was responding to a court decision holding that FedEx Ground's business model was not what FedEx Ground said it was and that would require FedEx Ground to pay millions of dollars to drivers for what had occurred in the past.

It stretches the language to describe as "abusive" an attempt to stop doing that for which one has just been ordered to pay damages. The plaintiffs take the position that the new model is no different than the old except the California drivers will have multiple, rather than single, work areas. The drivers, say the [*22] plaintiffs, still are employees rather than independent contractors. And perhaps the plaintiffs are right. But FedEx Ground has some reason to think, from the record in the Estrada litigation, that the law views MWA contractors differently than SWA contractors. If FedEx Ground is wrong on that point, the company might be required to pay post-"California Transition" damages--but no such damages will be required if FedEx Ground is right on that point.

The court doesn't doubt the plaintiffs' affiants' assertions that the "California Transition" has a chilling effect in that it makes drivers fear participation in this case. But a change in a business model seems likely to follow from an appellate's court telling a company that its previous business model is such as to require the payment of millions of dollars in damages. Few changes in business models are cost-free to everyone involved, and suits challenging business models often produce such changes. In effect, the plaintiffs' motion for a preliminary injunction asks that the court to make FedEx Ground continue the business model for which it is being sued and for which the plaintiffs seek damages. That is not the sort of order the Gulf [*23] Oil Court contemplated.

Federal Rule of Civil Procedure 23(d) does not justify the preliminary injunction sought here.

B.

Federal Rule of Civil Procedure 65 generally covers issuance of preliminary injunctions. FedEx Ground argues that the court has no authority to award preliminary injunctive relief to benefit the uncertified putative class, as distinct from the named plaintiffs, under Rule 65. The argument appears to be a strong one. The putative class members aren't parties to the action at this point in the proceedings. A court generally cannot base injunctive relief under Federal Rule of Civil Procedure 65 on threatened harm to non-party putative class members:

> Because a class has not been certified, the only interests at stake are those of the

named plaintiffs. Some own properties that may be affected in the future by the Fast Track program, but their interests can be protected by an injunction that prevents the City from demolishing their properties. That is the point of [Los Angeles v. Lyons, 461 U.S. 95, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)]: A wrong done to the plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified. Why else bother with class actions?

McKenzie v. City of Chicago, 118 F.3d 552, 555 (7th Cir. 1997) [*24] (citation omitted). Four of the named plaintiffs are California SWA contractors who might have standing to seek preliminary injunctive relief in their own behalf, but they haven't asked for such relief and the parties haven't addressed that issue.

The plaintiffs' citations are not inconsistent with the law as FedEx Ground explains it. In Moore v. Summers, 113 F. Supp. 2d 5, 29 (D.D.C. 2000), which the plaintiffs' reply brief describes as "finding preliminary injunction barring retaliatory conduct pre-class certification warranted based on chilling effect such conduct would have on rights of putative class members," the district court actually denied injunctive relief despite finding that some post-filing actions taken by the defendant Secret Service were likely to deter potential class members from coming forward with their claims. Recinos-Recinos v. Express Forestry, Inc., No. Civ.A. 05-1355, 2006 U.S. Dist. LEXIS 2510, 2006 WL 197030 (E.D. La. Jan. 24, 2006), in which the court issued a protective order under Rule 23, involved actual communications with putative class members, albeit accompanied by physical threats and bribes by alleged agents of the defendants, who defended against the protective order solely [*25] on the basis of the evidence and not any claim of impermissibility of an injunction on non-constitutional grounds. Mevorah v. Wells Fargo Home Mortgage, Inc., No. C 05-1175, 2005 U.S. Dist. LEXIS 28615, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005), involved a Rule 23 motion to correct alleged misrepresentations by the defendant.

Nonetheless, too little case law specifically addresses the propriety of relief in the circumstances presented here for the court to hold comfortably that the requested injunction relief lies beyond the court's power under Rule 65. Because the preliminary injunction is inappropriate on several other grounds, the court assumes, without deciding, that Rule 65 would allow preliminary injunctive relief for the benefit of non-party

putative class members were things as the plaintiffs see them.

1.

The first thing a plaintiff must show in seeking a preliminary injunction under Rule 65 is a likelihood of success on the merits. Eco Mfg. LLC v. Honeywell Int'l, Inc., 357 F.3d 649 (7th Cir. 2003) (preliminary injunction properly denied when plaintiff showed no likelihood of success). The plaintiffs have not shown a better than negligible chance of success on the merits of their retaliation claim. Later [*26] developments in the case might, of course, result in a plaintiffs' victory, but the court must evaluate the existent record when considering a preliminary injunction.

FedEx Ground argues that the plaintiffs have no likelihood of success because nothing in the record indicates that they are employees of FedEx Ground, as distinct from independent contractors who would have no FMLA rights vis-a-vis FedEx Ground. The court cannot agree. This case is part of an ML docket in which several filings applicable to all constituent actions disclose areas in which FedEx Ground controls its drivers' performance of their tasks. Whether that control is such as to make the drivers "employees" under federal or any state law remains to be decided, but the plaintiffs have come forth with enough to show that they might win. Further, while the Estrada decision is not yet final and so does not yet (if it ever will) amount to collateral estoppel, its existence demonstrates that FedEx Ground recently exercised enough control over its drivers to amount to an employer over some employees under someone's law.

While the plaintiffs have at least some chance of proving they are employees rather than independent contractors, [*27] the rest of their FMLA retaliation claim is strung together too loosely to support a finding of likelihood of success at this juncture. To prevail on a retaliation claim under the FMLA, the plaintiffs will need to prove that FedEx Ground is terminating their SWA contracts because they engaged in activity protected by the FMLA. Burnett v. LFW, Inc., 472 F.3d 471, 481-482 (7th Cir. 2006). No causal connection between the FedEx Ground "California Transition" and any protected activity by the plaintiffs seems even remotely apparent.

The filing of the Estrada case would not appear to be protected activity under the FMLA. The court recognizes that there may have been issues in Estrada that were not appealed and of which this court is unaware, but the appellate decision in Estrada makes no mention of any federal employment laws; it reports that the drivers were found to be employees within the meaning of Section 2802 of the California Labor Code. 154 Cal. App. 4th at 10. See also Kodl v. Board of Educ. Sch. Dist. 45, 490 F.3d 558, 563 (7th Cir. 2007) (complaints of general

harassment not protected activity under federal employment discrimination laws). Further, the temporal disconnect between [*28] the filing of Estrada in 1999 and the 2007 "California Transition" announcement is far too great to support--and indeed, tends to negate--any inference of retaliatory intent in 2007. *See, e.g.,* Scaife v. Cook County, 446 F.3d 735, 742 (7th Cir. 2006) ("But rather than create an inference of causation, the timing of Scaife's suspensions weighs against him."). Further, since FedEx Ground is treating all California SWA contractors identically so far, it appears unlikely that the plaintiffs can establish a retaliation claim via the indirect method by showing that other employees were treated more favorably. *See* Hull v. Stoughton Trailers, LLC, 445 F.3d 949 (7th Cir. 2006) (prima facie case of retaliation not made out without proof that plaintiff was treated less favorably than similarly situated employees who did not engage in protected FMLA activity).

The drivers' victory in the Estrada suit seems to be the event for which the plaintiffs say FedEx Ground is retaliating, and FedEx Ground agrees that the appellate decision in Estrada was a (perhaps the primary) motivating factor in the "California Transition." The court is aware of no authority for the proposition that winning a lawsuit [*29] is a separate protected activity from filing the suit, so the same timing problem may plague this theory. More importantly, though, winning a lawsuit under a provision of the California Labor Code would not seem to be activity protected by the federal Family Medical Leave Act and so would not support a retaliation claim under the federal act.

The court simply is unable to imagine what protected activity is said to have been undertaken by putative class members that were not part of the class in Estrada. The Family Medical Leave Act supports one of the claims in this suit, but the plaintiffs filed this suit in 2005, again too long ago to support, and perhaps so long ago as to defeat, an inference of retaliatory motive.

For all these reasons, the court concludes that plaintiffs have shown no likelihood of success on the merits of their FMLA retaliation claim. In the same spirit in which the court handled the issue of its authority to issue the requested injunction, though, the court concedes the possibility that the plaintiffs have shown a better than negligible chance of success (though not at all a strong one) and proceeds with the balance of the analysis.

2.

The plaintiffs have not demonstrated [*30] a threat of irreparable injury. An injury is not irreparable if there is an adequate remedy at law, and there is an adequate remedy at law if the injury can be compensated by money damages. If the plaintiffs or putative class members are losing their jobs for an illegal reason, those losses are compensable by an award of damages. East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d 700 (7th Cir. 2005); Bedrossian v. Northwestern Memorial Hosp., 409 F.3d 840 (7th Cir. 2005). If the plaintiffs or punitive class members are being required to sign illegal waivers and/or indemnity clauses, it is difficult to articulate any harm, irreparable or otherwise, from signing an unenforceable waiver.

The plaintiffs' affidavits from drivers who worry for their livelihoods if they step forward raise concern; loss of class members and eager witnesses cannot easily be quantified in dollars. But while the plaintiffs have cited cases that establish a court's authority to enjoin a defendant from picking off potential members by bribe, thuggery, or misdirection, Recinos-Recinos v. Express Forestry, Inc., No. Civ.A. 05-1355, 2006 U.S. Dist. LEXIS 2510, 2006 WL 197030 (E.D. La. Jan. 24, 2006); Mevorah v. Wells Fargo Home Mortgage, Inc., No. C 05-1175, 2005 U.S. Dist. LEXIS 28615, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005), [*31] none of the cases suggest an independent right to have fellow class members or enthusiastic witnesses that can be protected from otherwise lawful business conduct.

3.

To the extent the plaintiffs might be said to have established that they will suffer some irreparable harm without the requested injunctive relief, they have not established that such a risk of harm outweighs the risk of irreparable harm to FedEx Ground if the injunction issues and is later found to have been issued in error.

> The court appraises the risk of irreparable harm to the parties not simply by reference to what they will lose by an unfavorable ruling today, but rather by reference to the harm of error: what irreparable harm would denial of a preliminary injunction cause to [the movant] and the public if the trial reveals that [the movant] is entitled to relief; and what irreparable harm will the granting of an injunction do to [the opponent] and the public if the trial reveals that [the movant] is not entitled to relief? Once those evaluations are made, the court balances likelihood of success and the risk of irreparable harm on a sliding scale: the better a party's chances of winning at trial, the less the balance [*32] of harms needs to favor that party.

AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 831 (7th Cir. 2002).

The Estrada appellate decision indicates that continuation of the pre-"California Transition" model might subject FedEx Ground to damages awards. Such awards would themselves be compensable by damages, but could outgrow the plaintiffs' ability to pay them; certainly this record affords the court no basis on which to determine the amount of the bond the plaintiffs would be required to post as a condition of preliminary injunctive relief. *See* Mead Johnson & Co. v. Abbott Lab., 201 F.3d 883, 888 (7th Cir. 2000) ("When setting the amount of security, district courts should err on the high side. . . . Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.").

Further, uncertainty as to the status and future of SWA contractors would menace FedEx Ground's ability to maintain a stable work force in its heaviest business season, threatening incalculable damages to FedEx Ground's till, good will, and future business.

The balance of the harms greatly favors FedEx Ground [*33] and disfavors issuance of the requested injunction.

III

For all of these reasons, the court DENIES the plaintiffs' motion for temporary restraining order and preliminary injunction [docket # 878].

SO ORDERED.

ENTERED: October 12, 2007

/s/ Robert L. Miller, Jr.

Robert L. Miller, Jr.

Chief Judge

United States District Court

**Citation #2**
**2001 U.S. Dist. LEXIS 13893**

LEXSEE



Positive
As of: Feb 26, 2008

**RALPH OLDSMOBILE INC., on behalf of itself and all others similarly situated, Plaintiff, -against- GENERAL MOTORS CORPORATION, Defendant.**

**99 Civ. 4567 (AGS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2001 U.S. Dist. LEXIS 13893**

**September 7, 2001, Decided**
**September 7, 2001, Filed**

**DISPOSITION:**     [*1]  Plaintiff's motion granted in part and denied in part.

**COUNSEL:**  For  GENERAL  MOTORS CORPORATION, defendant: Christine A. Button, Bingham Dana LLP, Diane C. Hertz, Bigham, Dana L.L.P., New York, NY.

For GENERAL MOTORS CORPORATION, counterclaimant: Christine A. Button, Bingham Dana LLP, Diane C. Hertz, Bigham, Dana L.L.P., New York, NY.

**JUDGES:** ALLEN G. SCHWARTZ, U.S.D.J.

**OPINION BY:** ALLEN G. SCHWARTZ

**OPINION**

**MEMORANDUM ORDER**

ALLEN G. SCHWARTZ, DISTRICT JUDGE:

Plaintiff moves, pursuant to Fed. R. Civ. P. 23, for an order requiring defendant "to cease and desist its practice of obtaining ex parte releases from putative Class members," voiding those releases already obtained, and requiring defendant "to send a Court-approved corrective notice" that any such releases have been voided. [1] As set forth more fully below, the motion is granted in part and denied in part.

1  Plaintiff also sought the name and address of each dealer who signed a release after this action was filed. Because defendant has provided that information (Aff. of Charles F. Seaburg dated July 11, 2001 ("Seaburg Aff.") Ex. A), this portion of the motion is denied as moot.

I. Background

Plaintiff Ralph Oldsmobile Inc. ("Ralph Olds") filed this purported class action on behalf of all franchised General Motors dealers [*2] in New York State. Ralph Olds alleges that defendant General Motors Corporation ("GM") violated New York Vehicle and Traffic Law § 465 ("VTL § 465"), which requires that franchisor car manufacturers reimburse their franchised dealers for warranty repairs at not less than market rates. According to Ralph Olds, GM paid its franchised dealers less than the statutory rate for parts used in warranty repairs. (See generally Am. Compl.) On September 29, 2000, the Court denied GM's motion for summary judgment, Ralph Oldsmobile Inc. v. GMC, 2000 U.S. Dist. LEXIS 14244, 2000 WL 1459767 (S.D.N.Y. Sept. 29, 2000), and on January 23, 2001 denied GM's motion for reconsideration or, in the alternative, for leave to proceed with an interlocutory appeal. Ralph Oldsmobile, Inc. v. GMC, 2001 U.S. Dist. LEXIS 421, 2001 WL 55729 (S.D.N.Y. Jan. 22, 2001). Familiarity with those decisions is assumed herein. On January 29, 2001, the Court issued an order allowing plaintiff's counsel to send a notice to all putative class members, responding to a letter sent to

GM dealers by another law firm (which letter allegedly included misrepresentations about this action).

While this action has been pending, GM announced that it will discontinue its Oldsmobile line. (Seaburg Aff. P 2.) In connection with the discontinuance, GM has offered Oldsmobile [*3] dealers throughout the country certain transition payments, above and beyond what GM is required by its dealer contracts to pay for termination of Oldsmobile dealerships. (*Id.* PP2-4.) To obtain these transition payments, an Oldsmobile dealer must sign a termination and release agreement. (*Id.* PP 5-6.) The agreement provides, in relevant part, that the dealer releases all Oldsmobile-related claims against GM except, *inter alia*, claims relating to "reimbursement to Dealer of unpaid warranty claims for warranty services performed by Dealer within six (6) months prior to the effective date of termination . . . ." (Aff. of Lester L. Levy in Support of Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief dated June 27, 2001 ("Levy Aff.") Ex. B at 2.) Plaintiff sent a letter to defendant voicing concern about the releases, and requesting the exact language of the release and information about dealers who had signed releases. (Levy Aff. Ex. A.) Defendant provided the release language, refused to identify the dealers who had signed releases, and asserted that plaintiff's January 2001 notice [*4] had advised putative class members of their rights. (Levy Aff. Ex. B.) Plaintiff replied that it considers improper GM's offering this release without referring to this action and without informing dealers of the fact that dealers signing the release may have waived or limited their rights in this action. Plaintiff requested that GM stop obtaining such releases and treat all previously obtained releases as null and void. (Levy Aff. Ex. C.) GM did not agree to this request. Plaintiff then filed the instant motion.

## II. Discussion

The Supreme Court has held that Rule 23 allows a court, in appropriate circumstances, to restrict communications between a party and members of a class or putative class. *Gulf Oil v. Bernard*, 452 U.S. 89, 68 L. Ed. 2d 693, 101 S. Ct. 2193 (1981). Acknowledging the possibility of abuses in class action litigation, but seeking to avoid infringing parties' rights, the Supreme Court held that:

an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential

interference with the rights of the parties. [*5] . . . In addition, such a weighing -- identifying the potential abuses being addressed -- should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Id.* at 101-02 (footnotes omitted). Although *Gulf Oil* concerned communications between counsel for the named plaintiff and potential class members, its rationale has been found to apply to communications between defendants and potential class members as well. *See, e.g., Bublitz v. E.I. DuPont de Nemours & Co.*, 196 F.R.D. 545, 547 (S.D. Iowa 2000); *Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 675 n.1 (N.D. Ga. 1999). *Gulf Oil*, and a court's power to restrict communications between parties and potential class members, apply even before a class is certified. *See, e.g., Bublitz*, 196 F.R.D. 545; *Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D. 239, 242-43 (E.D. Tex. 1997).

Ralph Olds contends on this motion that the Court should restrict GM's communication with members of the putative class because GM's unilateral obtaining of releases is abusive. Specifically, [*6] Ralph Olds contends that GM's communications with Oldsmobile dealers are coercive and do not provide adequate information about the rights waived by the releases. (Mem. of Law in Supp. of Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief at ("Pl.'s Mem.") 6-11.) GM responds that it is entitled to settle with individuals prior to class to class certification, that there is no coercion, and that there is no evidence that any dealer has waived its rights unknowingly or involuntarily. GM further argues that the relief sought by plaintiff is overbroad, but offers to add a minimal notice about this litigation to its agreements with Oldsmobile dealers in New York. (Opp. of Def. General Motors Corp. to Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief ("Def.'s Mem.") at 7-16.) In reply, plaintiff acknowledges that Second Circuit precedent authorizes GM to settle with individuals who may potentially be class members, but states that GM is acting improperly because it is obtaining releases without properly [*7] disclosing what is being released and without providing adequate consideration for the released claims. Plaintiff also rejects GM's proposed notice as inadequate. (Reply Mem. of Law in Supp. of Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief ("Reply Mem.") at 3-13.)

The record supports findings of potential abuse in GM's communications with Oldsmobile dealers regarding the releases. Specifically, the record supports findings of potential coercion and potentially unknowing waivers of the rights asserted in this action. The record does not support a finding of lack of adequate consideration. As to coercion, "[a] unilateral communications scheme . . . is rife with potential for coercion. 'If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.'" *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1202 (11th Cir. 1985). In *Kleiner*, the Eleventh Circuit agreed with the district court that it was coercive for the defendant bank to call borrowers who were potential class members [*8] and ask them to opt out of the litigation. The Eleventh Circuit noted that many of the potential class members were not only current borrowers, but might depend upon the bank for future financing, might need "discretionary financial indulgence from their loan officers" and might not have easy access to other sources of credit. *Id.* Similarly, the court found coercion in a continuing business relationship in *Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630 (N.D. Tex. 1994). In that case, one retail hardware store filed a purported class action against a member-owned hardware wholesaler, of which the retailer was one member-owner. The wholesaler sent three letters to all of its Texas members, who were also the potential class members. The letters denigrated the suit, claimed it would cost the wholesaler (and therefore its members-owners) substantial sums, and asked potential class members not to participate. *Id. at 631-32*. Citing *Kleiner*, the court found a potential for coercion. The court noted that potential class members relied upon the defendant for information and for low prices on hardware. As such, the court found the potential class [*9] members "particularly susceptible to believing defendant's comments that the lawsuit [would] cost them money." *Id. at 633*.

*Hampton Hardware* was distinguished, however, by the court in *Jenifer v. Delaware Solid Waste Auth.*, 1999 U.S. Dist. LEXIS 2542, Nos. CIV.A 98-270 MMS, CIV.A 98-565 MMS, 1999 WL 117762 (D. Del. Feb. 25, 1999). In *Jenifer*, solid waste haulers filed putative class actions challenging regulations implemented by the defendant. The regulations required the plaintiffs to dispose of waste in Delaware, where disposal fees were higher than in other states. Plaintiffs contended that the defendant contacted potential class members and offered them a new pricing plan. Under this plan, the regulations would be eliminated and fees in Delaware would remain at then-current rates. However, potential class members who signed a three-year contract to dispose of their waste in Delaware, and agreed to release defendant from any liability relating to the regulations, would receive a substantial rebate on their disposal fees. *Id.* at *1. The court

acknowledged that an ongoing business relationship may give rise to coercion, citing, *inter alia*, *Kleiner* and *Hampton Hardware*. [*10] *Id.* at *4. The court noted that "where there is a relationship that is inherently coercive, the court does not need to make a finding that a particular abuse has occurred. . . . The court, however, must still require a clear record of threatened abuses." *Id.* On the record presented, the court did not find coercion. It could not conclude that the pricing plan was or was not formulated in response to the lawsuit. It could not conclude that potential class members would be threatened into abandoning their claims. Unlike the letters in *Hampton Hardware*, which pertained solely to the lawsuit, the communications about the pricing plan "related to a business proposition which potential class members are free to reject if they decide the costs outweigh the benefits." *Id.* at *5. Accordingly, the court refused to forbid the defendant from communicating with potential class members. However, the court did order defendant to notify potential class members of the pendency of the lawsuit before they agreed to the release included in the pricing contracts. *Id.* at 7-8. [2]

2    Courts have reached different conclusions about whether an employer-employee relationship is sufficiently coercive to warrant restrictions on communication between a defendant and potential class members. *Compare Bublitz*, 196 F.R.D. 545 (restrictions imposed) *and Abdallah*, 186 F.R.D. 672 (same) *with Burrell*, 176 F.R.D. 239 (no restrictions imposed) *and Matarazzo v. Friendly Ice Cream Corp.*, 62 F.R.D. 65 (E.D.N.Y. 1974) (stating that its is a better practice to have releases from potential class members pre-approved by court but not requiring approval nor precluding defendant from communicating with potential class members).

[*11]    While the instant action appears somewhat similar to *Jenifer*, a finding of potential coercion is warranted here. Concededly, there is no evidence of actual coercion; and Oldsmobile dealers can refuse to sign the release, choosing to forgo the transition payments in favor of the combination of termination payments under the dealer agreement and the potential for damages in this action. (*See* Seaburg Aff. PP 2-8.) Also, as GM argues (Def.'s Mem. at 9), its communications about the transition payments do not relate solely to this action. However, the relationship between the parties here is distinguishable from that in *Jenifer*. Here, as in *Kleiner* and *Hampton Hardware*, the potential class members depend upon the defendant for information, supplies, and credit. (*See, e.g.*, Aff. of Celeste Dorsey-Grooms Submitted in Supp. of Mot. of Def. General Motors Corp. for Summ. J. dated Sept. 29, 1999, Ex. A.) Like the borrowers in *Kleiner* who had no other source of credit, the GM

2001 U.S. Dist. LEXIS 13893, *

dealers have no other source of GM vehicles. (*Id.*) This is important because some of the dealers who have already signed releases sell not only Oldsmobiles, but other GM lines as well. (Seaburg [*12] Aff. P 9, Ex. A.) Their continued success and, indeed, existence may depend upon GM's good will. The record, therefore, presents the clear potential for abuse.

The record also warrants a finding of a potential for unknowing waivers resulting from a lack of information. Although the release purports to waive a dealer's claims for unpaid warranty claims that are more than six months old, the release does not mention this action. (Levy Aff. Ex. B at 2.) Nor does the record reflect any mention of this action in any other communications made to date by GM regarding the transition payments. There is thus a risk that dealers may sign the release without knowing what they are releasing. Such an unknowing release would be abusive and warrant relief. GM contends that the notice sent by plaintiff to potential class members, and the letter to which it was responding, advised all potential class members of this action. (Def.'s Mem. at 11.) There is no evidence, however, as to whether any particular dealer received that notice or read it. Moreover, as plaintiff points out, the notice from plaintiff states that, because this is putatively a class action, dealers need do nothing to preserve their [*13] rights under VTL § 465. (Reply Mem. at 11-12.) Such language may lead dealers who read the notice to think that the release does not affect their claims under VTL § 465. GM also argues that former named plaintiff John Martin Motors signed a release agreement. (Def.'s Mem. at 6-7, 11.) What John Martin Motors knew or did, however, is not necessarily indicative of what any other dealer knew or did. Finally, GM offers to provide certain notice "in order to avoid the remote possibility that dealers will unknowingly waive claims." (Def.'s Mem. at 16.) Even in *Jenifer*, where the court found no coercion, the court did express concern about releases possibly granted without adequate notice and did order notice. The record sufficiently supports a finding of potential unknowing waivers.

The record does, however, support a finding as to the presence of consideration for the releases. Ralph Olds argues in its reply memorandum that because the transition payments are the same in New York as they are in every other state, no consideration is being paid for the warranty claims that are being waived. (Reply Mem. at 5-7.) However, Ralph Olds assumes more than is justified by the record. Certain [*14] states other than New York have statutes that require manufacturers to reimburse dealers for warranty repairs. *See, e.g.,* 2000 U.S. Dist. LEXIS 14244, 2000 WL 1459767, at *6. While this Court's prior decisions in this action distinguish those statutes from VTL § 465, 2000 U.S. Dist. LEXIS 14244,

2000 WL 1459767, at *6; 2001 U.S. Dist. LEXIS 421, 2001 WL 55729, at *2, those statutes do provide dealers in other states with certain rights. The record contains no information as to what actions may or may not be pending in other states under those states' analogs to VTL § 465. Whether or not any such actions are pending, dealers in other states are waiving their rights under applicable warranty reimbursement statutes to the same extent, if any, that dealers in New York are waiving their rights under VTL § 465. (Seaburg Aff. PP 2-7.) Thus, dealers in New York are not necessarily receiving any less than dealers in any other state. Since dealers in New York and elsewhere are providing the release as part of a broader agreement under which they receive certain payments, the Court is unable to find, absent additional evidence not present in the record, that no consideration is being provided for the releases.

Balancing the findings [*15] supported by the record against the need to limit GM's speech as little as possible in the circumstances, *see Gulf Oil*, 452 U.S. at 101-02, the appropriate remedy is to require that notice be given. *See, e.g., Jenifer*, 1999 WL 117762, at *7-*8. GM offers to include the following notice in future agreements:

> The release covers any claims arising from Oldsmobile dealership operations, including, without limitation, any claims relating to reimbursement for warranty parts used in Oldsmobile vehicles. Such claims have been asserted in *Ralph Oldsmobile, Inc. v. General Motors Corp.*, No. 99 Civ. 4567 (AGS), a lawsuit brought by a former GM dealer as a potential class action in the United States District Court for the Southern District of New York. The Transition Agreement does not include a release of claims arising from Dealership Operations for GM lines other than Oldsmobile.

(Def.'s Mem. at 16.) Plaintiff argues that this is insufficient because it believes the dealers are receiving no consideration. (Reply Mem. at 12-13.) As noted above, the record does not support plaintiff's consideration argument. The Court does agree, however, [*16] that GM's proposed notice is inadequate. The notice does not state which dealers may be in the class, if a class is certified. It does not provide information as to the status of the action. It does not indicate how a dealer may obtain more information about the case or contact plaintiff's counsel. It does not clearly state that signing the release may prevent a dealer from recovering damages in this action. And it does not speak at all to the releases that have al-

ready been executed. This information should, in the opinion of the Court, be included in such notice.

Plaintiff's proposed relief, forbidding GM from entering into the agreements that include the release, is inappropriate. First, it is not warranted by the potential abuses. Requiring that notice be provided is sufficient to cure any potential unknowing waivers. There is no way to completely eliminate the potential for coercion in the relationship between GM and its dealers. Courts cannot simply interpose themselves in the business relationship between a franchisor and its franchisees each time a franchisee files a putative class action against the franchisor. Notifying the dealers in this action, and their ability to communicate [*17] with counsel and participate in the action, should, however, provide a reasonable measure of protection. Second, prohibiting GM from entering into further agreements would infringe upon GM's freedom of speech and upon GM's ability to conduct its business. The cases upon which plaintiff largely relies for its proposed remedy, *Hawkins v. Holiday Inns, Inc.*, 1978 U.S. Dist. LEXIS 20083, No. C-72-217 (W.D. Tenn. Jan. 18, 1978), and *In re Int'l House of Pancakes Litig.*, 1972 U.S. Dist. LEXIS 14958, No. 77 (W.D. Mo. Feb. 24, 1972), are inapposite. Both cases pre-date *Gulf Oil* and may not comply with its requirements. Furthermore, *Hawkins* relies upon findings that the defendant intentionally coerced potential class members by requiring them to sign releases if they wished to have their franchise agreements renewed, continued, or modified or if they desired extra time to cure any default under the franchise agreements. 1978 U.S. Dist. LEXIS 20083, at *1–*2. Plaintiff provides no comparable evidence here. Instead, GM requires the execution of releases only for potential class members who desire payments above and beyond what they are entitled [*18] to under their dealer contracts with GM. In addition, the *Hawkins* court upheld the execution of releases if they were negotiated with proper counsel, meaning either class counsel for class members or other lawyers for potential class members who opted out. Here, since plaintiff has not, to date, moved for class certification, no dealer has been afforded the opportunity to opt out. Here, since plaintiff has not, to date, moved for class certification, no dealer to use plaintiff's counsel to negotiate a release simply because plaintiff has not yet sought to have the class certified. At most, *Hawkins* would counsel the Court to require that GM only obtain releases from dealers who have consulted with *some* attorney. *International House of Pancakes* barred the defendant from repurchasing franchises, with or without a release, because the issues in the case were simple, trial would end within the calendar year, reviewing the many releases would be burdensome on the court, and the court did not believe that the defendant should be able to negotiate individual settlements with class members. Here, the issues are complex, this case

will not be tried this year (or probably even [*19] next), only fifteen releases have been executed to date, no class has been certified, and the Second Circuit has held that defendants may negotiate individual settlements prior to certification of a class. *Christensen v. Kiewit-Murdock Inv. Corp.*, 815 F.2d 206, 213 (2d Cir. 1987); *Weight Watchers v. Weight Watchers Int'l, Inc.*, 455 F.2d 770, 773 (2d Cir. 1972). For all of these reasons, barring GM from obtaining releases is unwarranted.

The Court declines at this time to void the releases that have already been executed. First, GM calls into question the Court's authority to do this (Def.'s Mem. at 15); Ralph Olds does not confront this issue in its reply. Second, even if the Court has the authority to void the releases, no dealer that has signed a release has asked the Court to void its release. Third, there is nothing in the record indicating, one way or the other, what most of the dealers who signed the releases did or did not know about this action. The only dealer as to whom the Court has specific information is former plaintiff John Martin Motors, and it would be difficult to find that a former named plaintiff entered into an unknowing waiver. [*20] Fourth, even if a dealer knew nothing about this action when it signed the release, that dealer might wish to ratify the release even after it learns of this action. The appropriate solution is to include in the notice to potential class members a statement to the effect that the Court will consider an application to void a release made by any dealer who signed such a release prior to receiving the notice. That way, dealers will have been advised of their rights; any dealer who wishes to seek to void its release can submit papers; the Court can consider this issue with knowledge of the applicable facts and law; and any dealer who wishes to settle will be able to maintain its release.

### III. Conclusion

For the reasons set forth above, the motion is granted in part and denied in part. Specifically, the Court finds that: GM's communications with potential members of the putative class warrant remedial action under Fed. R. Civ. P. 23; the specific relief requested by Ralph Olds is not warranted; to prevent potential abuse, notice must be sent, at GM's expense, to potential members of the putative class, providing them with the information indicated above; and any potential member of [*21] the putative class who has already signed a release must be afforded an opportunity to apply to the Court to have that release voided. The parties shall attempt to agree upon a notice, which shall be subject to the Court's approval and which may be provided to dealers. In the event that the parties are unable to agree within 30 days of this order, the Court shall issue an order including the language of the appropriate notice.

2001 U.S. Dist. LEXIS 13893, *

SO ORDERED.

ALLEN G. SCHWARTZ, U.S.D.J.

Dated: New York, New York

September 7, 2001

LEXSEE



Caution
As of: Feb 26, 2008

**SYLVESTER JENIFER, T/A Vernon's Home Improvements on behalf of itself and all others similarly situated, NATIONAL SOLID WASTE MANAGEMENT ASSOCIATION; ALL-RITE RUBBISH REMOVAL, INC.; ALL-RITE RUBBISH REMOVAL, INC., d/b/a Metcalf; J&M of DE., INC., ARROW DISPOSAL OF SMYRNA, INC., WALTER S. BANDURSKI, INC.; and MODERN DISPOSAL, INC. on behalf of themselves and all others similarly situated, Plaintiffs, v. DELAWARE SOLID WASTE AUTHORITY, Defendant.**

**Civ. A. Nos. 98-270/98-565 MMS (Consolidated)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**1999 U.S. Dist. LEXIS 2542**

**January 13, 1999, Argued, Wilmington, Delaware
February 25, 1999, Decided**

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**COUNSEL:** For plaintiffs: David Staats, Esq., Law Offices of David Staats, P.A., Wilmington, Delaware.

For plaintiffs: Jeffrey A. Klafter, Esq., John P. Coffey, Esq., Of Counsel, Bernstein Litowitz Berger & Grossman LLP, New York, New York.

For defendant: F. Michael Parkowski, Esq., Parkowski, Noble & Guerke, P.A., Dover, Delaware.

For defendant: John C. Phillips, Jr., Esq., special counsel, Phillips, Goldman & Spence, P.A., Wilmington, Delaware.

For BFI Waste Systems of North America, Inc.: David S. Eagle, Esq., Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Wilmington, Delaware.

For BFI Waste Systems of North America, Inc.: David Zalesne, Esq., Jennifer A. Irrgang, Esq., Of Counsel, Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Philadelphia, Pennsylvania.

For Waste Management of Delaware, Inc.: James McC. Geddes, Esq., Ashby & Geddes, Wilmington, Delaware.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINION BY:** Murray M. Schwartz

**OPINION**

**MEMORANDUM OPINION**

Argued: January 13, 1999

Dated: February 25, 1999

Wilmington, Delaware

**SCHWARTZ, Senior District Judge**

**I. INTRODUCTION**

Two actions [*2] challenging the flow control regulations of defendant Delaware Solid Waste Authority ("DSWA") have been filed. The plaintiffs in each matter seek declaratory and injunctive relief and damages for violations of Article I, § 8, clause 3 of the United States Constitution (the "Commerce Clause") and Title 42, § 1983 of the United States Code. The Court has jurisdiction over both actions pursuant to 28 U.S.C. § 1331. The first action was filed on May 21, 1998, by Sylvester Jenifer. D.I. 1, Civil Action No. 98-270 MMS. [1] The second action was filed on October 2, 1998, by the National Solid Wastes Management Association ("NSWMA"),

Page 1

two solid waste haulers, and several former solid waste haulers. Civil Action No. 98-565 MMS. All plaintiffs are represented by the same counsel and both lawsuits were filed as a putative class action. The Court ordered the two cases consolidated on January 22, 1999. The putative class has not been certified. [2]

> 1  The Docket Item ("D.I.") number refers to either Civil Action No. 98-270-MMS or Civil Action Nos. 98-270/98-565-MMS (Consolidated), except where otherwise noted.

[*3]

> 2  Plaintiffs filed for class certification on January 29, 1999.

The present motion concerns informational meetings and other communications between DSWA and waste haulers. Plaintiffs allege that DSWA improperly contacted potential class members, and ask the Court to order that DSWA be enjoined from such *ex parte* contact.

## II. FACTS

The lawsuit challenges the constitutionality of DSWA's "flow control" regulations. [3] Plaintiffs allege that they have been forced to dispose of solid waste at DSWA facilities, where "tipping fees" are significantly higher. Plaintiffs allege that the DSWA flow control regulation is in violation of the "dormant commerce clause" as impermissible state interference in interstate commerce. The putative class members include all persons in the state of Delaware who delivered and transported solid waste generated within the state for disposal at DSWA facilities, and who paid fees to DSWA from May 21, 1995 until the time that the flow control regulation is abrogated. D.I. 1, P 11 (Jenifer complaint); D.I. 1, P 35 (NSWMA complaint, Civil Action No. 98-565).

[*4]

> 3  These regulations require that most solid waste generated within the state of Delaware must be disposed of in Delaware at a facility controlled by the defendant. *See* D.I. 37, App. 51 (Regulation 4.01).

Plaintiffs allege that in response to the lawsuit, DSWA has surreptitiously contacted members of the potential class and offered them a coercive "financial deal" in exchange for a release of liability for DSWA "flow control" regulations. Essentially, the "financial deal," known as a differential pricing plan, would eliminate flow control regulations, and thus, allow haulers to dispose of Delaware generated waste at out-of-state facilities. Disposal of solid waste within Delaware would remain at the current rate of $ 58.50 per ton. [4] However, waste haulers who sign a three-year contract to dispose of their Delaware generated waste at a DSWA facility

and who also agree to release DSWA from any liability concerning "flow control" regulations would receive an annual rebate of $ 10 per ton. [5]

> 4  The testimony at the January 13, 1999 hearing indicated that $ 58.50 per ton is a high rate as compared to other markets. D.I. 50, Tr. 82 (Harvey).

[*5]

> 5  Haulers may be eligible for a further rebate. If the DSWA receives more than 800,000 tons per year from all sources, DSWA will pay $ 8.50 into a pool for each excess ton and the haulers would receive a pro rata share of the pool based upon tonnage delivered.

## A. The Meetings Between DSWA And Waste Haulers

After the filing of the Jenifer action in May 1998, DSWA met a couple of times with its two largest customers, BFI Waste Systems of North America, Inc. ("BFI") and Waste Management of Delaware, Inc. ("Waste Management"), for preliminary discussions regarding modification of the flow control regulation and a possible rebate program. On November 18, 1998, DSWA again met with BFI and Waste Management. DSWA indicated that it was contemplating an amendment to the regulation so that its customers could dispose of solid waste generated within Delaware at any location, including out-of-state facilities. At this meeting, a differential pricing plan was discussed. DSWA made it known that the provision releasing DSWA from liability for its flow control regulation was a condition of participating [*6] in the differential pricing plan. D.I. 37, App. A-8, A-14. Plaintiffs' counsel had no notice of the meeting, and thus, were not present. On November 24, 1998, DSWA met with another group of smaller haulers and discussed the differential pricing plan. DSWA also stated it was considering the option of entering the business of solid waste disposal and directly competing against its customers. D.I. 37, App. A-16. Again, DSWA stated that the release from liability provision was a necessary provision in the contract. DSWA informed the smaller haulers that BFI and Waste Management, their largest competitors, reacted favorably to the differential pricing plan and were inclined to participate. D.I. 50, Tr. 68 (Vasuki). [6] Plaintiffs' counsel had no notice of and did not attend the November 24 meeting.

> 6  "Tr.  " refers to the page(s) of the transcript of the January 13, 1999 hearing. D.I. 50.

## B. Interim Order

According to the plaintiffs, the communications between DSWA and putative class members improperly

1999 U.S. Dist. LEXIS 2542, *

[*7] attempt to coerce putative class members not to participate in the litigation. Plaintiffs request that the Court enjoin DSWA from communicating with potential class members concerning the instant litigation. Plaintiffs base their motion seeking injunctive relief on Rule 23(d) of the Federal Rules of Civil Procedure. Further, plaintiffs ask that the Court order DSWA to send corrective notices, at defendant's expense, to all class members. The requested notices are to describe, inter alia, the claims asserted, relief sought by plaintiffs, and any prohibitions this Court may impose on DSWA's communications with class members. D.I. 36 at 7 (Plaintiffs' Pre-Hearing Brief). DSWA maintains that its communications with waste haulers were merely informational and that it did not intend to coerce or mislead the waste haulers.

Plaintiffs brought the defendant's communications to the Court's attention during telephonic hearings on December 2 and December 11, 1998. The Court without benefit of briefing entered an Interim Order on December 17, 1998. On January 7, 1999, BFI and Waste Management filed for relief from the Interim Order and plaintiffs' motion seeking injunctive relief limiting [*8] defendant's communications with class members. The Court held a hearing on January 13, 1999 to further consider the matter. [7]

> 7  At the evidentiary hearing, plaintiffs called N.C. Vasuki, CEO of DSWA, and William Davidson, President of the Maryland-Delaware Solid Waste Association and an officer of a potential class member. DSWA called F. Michael Parkowski, counsel to DSWA. BFI cross examined Davidson. Waste Management called E. Thomas Harvey, Regional Vice President of Waste Management. D.I. 50.

## III. DISCUSSION

### A. Legal Standard

The class has not been certified. [8] Rule 23(d) of the Federal Rules of Civil Procedure gives the court authority to limit communications with *class members* concerning the litigation. Therefore the first issue is whether the Court has the power to limit contacts with members of an uncertified class. I conclude the Court does have the requisite authority to limit contacts with putative class members. The purpose of Rule 23 is to protect the interests of absent class [*9] members and foster the fair and efficient resolution of class action issues. In re School Asbestos Litigation, 842 F.2d 671, 680 (3d Cir. 1988). District courts may issue Rule 23 orders to prevent abuses of the class action process. Id. at 680. The effect of a defendant attempting to influence potential plaintiffs not to join a potential class action is just as damaging to

the purposes of Rule 23 as a defendant that influences members of an already certified class to opt out. See Burrell v. Crown Central Petroleum, Inc., 176 F.R.D. 239, 243 (E.D. Tex. 1997) (citing Hampton Hardware, Inc. v. Cotter & Co., Inc., 156 F.R.D. 630, 632 (N.D. Tex. 1994)). In both scenarios, improper communications could diminish the size of the class or potential class, and thus, reduce the potential liability. Burrell, 176 F.R.D. at 243.

> 8  On December 30, 1998, plaintiffs filed a motion for injunctive relief limiting defendant's communications with class members. (D.I. 35).

It is therefore not surprising that a [*10] party in a class action may not send misleading communications because they pose a serious threat to the fairness of the litigation process. Gulf Oil Co. v. Bernard, 452 U.S. 89, 101 n. 12, 68 L. Ed. 2d 693, 101 S. Ct. 2193 (1981); Hampton Hardware, 156 F.R.D. at 632; In re Winchell's Donut Houses, 1988 Del. Ch. LEXIS 159, 1988 WL 135503, at *1 (Del. Ch. Dec. 12, 1988) ("Surely, a defendant may not, in its communications with class members prior to certification, deceive or mislead class members."). This court has condemned a defendant's communications attempting to affect a class member's decision to participate in the litigation. In re School Asbestos Litigation, 842 F.2d at 682 n.2; see also Manual for Complex Litigation (3rd edition 1995), P 30.24 (stating that defendants may not give false or misleading information or attempt to influence class members in making their decision whether to remain in the class).

Nonetheless, before a class action is certified, it will ordinarily not be deemed inappropriate for a defendant to seek to settle individual claims. In re Winchell's Donut Houses, 1988 WL 135503, at *1 (citing Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, [*11] Inc., 455 F.2d 770, 773 (2d Cir. 1972)); see Cada v. Costa Line, Inc., 93 F.R.D. 95, 98 (N.D. Ill. 1981) ("Individual class members who choose to settle (or to litigate or indeed just to forget about) their claims are simply opting out of the class, an opportunity available to them until there has been a class determination under Rule 23(c)."); Manual for Complex Litigation (3rd edition), P 30.24 (1995) (defendants ordinarily not precluded from communications with putative class members, including discussions of settlement offers with individual class members before class certification).

### B. Does The Conduct By DSWA Merit A Limitation Order?

The Court starts with the precept that it only should consider the narrowest possible relief "that limits speech as little as possible consistent with the rights of the parties under the circumstances." Gulf Oil, 452 U.S. at 102.

The Court must be cognizant of issuing orders limiting communications within the bounds of First Amendment principles. _Id._ at 100. Plaintiffs do not have to show actual harm, but only that a restricting order would guard against the "likelihood of serious abuses." _Id._ at 104. A demonstration that [*12] the "interests embodied in Rule 23 might be hindered is a sufficient finding upon which to base an order limiting contacts." _Hampton Hardware, Inc. v. Cotter & Co., Inc._, 156 F.R.D. at 633. The Supreme Court in _Gulf Oil_, however, articulated the need for "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." 452 U.S. at 101.

Plaintiffs argue that DSWA's proposal is likely to influence potential class members to give up their claims in this litigation. Plaintiffs assert that the communications were improper because the defendant's intent was to induce the major haulers into accepting the contract. They point out that if the major haulers received a $ 10 per ton cost advantage, then the smaller haulers would be forced to sign the contract because they could not effectively compete. Plaintiffs concede that a defendant in a prospective class action may engage in settlement discussions with prospective class members before class certification, but argue that the communications at issue attempt to influence potential class members not to participate in the class action. Further, plaintiffs [*13] urge that the communications are misleading because (1) DSWA misled smaller haulers invited to the November 24, 1998 meeting by characterizing its rebate for release proposal as a mere regulatory change, when the proposal was actually a settlement offer, and (2) the potential class members were never told about the benefits of the litigation.

The plaintiffs rely on _Hampton Hardware_ and the recently decided case of _Carnegie v. H&R Block, Inc._, (N.Y. Sup. Feb. 2, 1999). In _Hampton Hardware_, a member of a cooperative association of hardware stores filed suit against the association. The defendant sent three letters to individual members, asking them not to join the lawsuit. The first letter stated that the lawsuit would "cost you precious dollars and us time from our mission." 156 F.R.D. 630 at 631. The second letter stated that "by not participating in this suit, you will help save your Company expense in dollars and time." _Id._ at 632. The third letter stated that "by asking you to join the class, [plaintiff] is asking you to sue yourself." _Id._ The court held that the letters were improper because they were an attempt "to reduce the class members [sic] participation [*14] in the lawsuit based on threats to their pocketbooks." _Id._ at 633. The court noted that the ongoing commercial relationship between the defendant and

putative class members made the communications inherently coercive. _Id._

In _Carnegie v. H&R Block_, the defendant added a provision in its tax services contract that required the arbitration of claims after the initiation of a class action and before class certification. The plaintiff argued that the purpose of the arbitration clause was to destroy class members' entitlement to participate in the class action and to bypass court supervision of class action certification and notice procedure. _Id._ at F-2. The court agreed and held that the arbitration clause would not preclude class member participation in the litigation unless the members opted out after proper notice of the pendency of class action. _Id._ at F-6.

The Court recognizes that an ongoing business relationship, such as the relationship here between DSWA and the waste haulers, can increase the possibility that the communications between litigants are coercive. _See, e.g., Kleiner v. First Nat'l Bank of Atlanta_, 751 F.2d 1193, 1201 (11th Cir. 1985) (potential [*15] class members were bank customers of the defendant); _Hampton Hardware_, 156 F.R.D. at 633 (potential class members were hardware stores whereas defendant was the hardware supplier); _but see In Re Winchell's Donut Houses_, 1988 WL 135503, at *1 ("Particularly where the class is comprised of persons with whom the defendant has an ongoing commercial relationship, it would seem distinctly ill-advised to attempt to require the defendant to deal with what may be an important aspect of a commercial relationship only through the channel of a self-appointed class action plaintiff."). Where there is a relationship that is inherently coercive, the court does not need to make a finding that a particular abuse has occurred. _See Burrell v. Crown Central Petroleum, Inc._, 176 F.R.D. at 244 (citing _Kleiner_ and _Hampton Hardware_). The court, however, must still require a clear record of threatened abuses. _Gulf Oil_, 452 U.S. at 101; _Hampton Hardware_, 156 F.R.D. at 632. There must be some evidence that justifies an interference with DSWA's speech. _Burrell_, 176 F.R.D. at 244. The Court is not persuaded that DSWA, one way or the other, would have formulated the differential [*16] pricing program in the absence of the filing of these lawsuits. The Court is persuaded that it was the practice of DSWA to usually give waste haulers 18 months notice before any proposed changes in tipping fees. The time line is much shorter for the differential pricing program, thus leading to an inference that DSWA is in a hurry for reasons not yet articulated. D.I. 50, Tr. 24 (Vasuki). On the other hand, plaintiffs have not provided the Court with a clear record to show that the communications were misleading or coercive, or an improper attempt to undermine Rule 23 by encouraging putative class members not to join the suit.

The Court finds that the evidence does not establish that putative class members would be threatened or coerced into foregoing any claims in the present lawsuit. The test for coercion is whether the conduct somehow overpowers the free will or business judgment of the potential class members. *See Mobilificio San Giacomo S.p.A. v. Stoffi*, 1998 U.S. Dist. LEXIS 3288, 1998 WL 125536, at *9 (D. Del. Jan 29, 1998). Unlike the coercive letters in *Hampton Hardware*, plaintiffs were not (1) warned of the potential cost of the lawsuit to them, (2) "specifically advised not to participate [*17] in the lawsuit," and (3) "told that by participating in the lawsuit they are suing themselves." 156 F.R.D. at 632-33. The letters in *Hampton Hardware* served no purpose other than to warn potential class members that they would pay if they participated in the lawsuit. *Id.* at 633. The communications here relate to a business proposition which potential class members are free to reject if they decide the costs outweigh the benefits. Further, the differential pricing program is open to all haulers on the same terms.

Those waste haulers who do not participate would be free to take their solid waste out of state at possible lower disposal costs. Further, they would be able to pursue their claims in this litigation and have the opportunity to receive damages. While this business decision could be difficult, the waste haulers are free to weigh the risks and benefits of participating in the class action. If a hauler wishes to become a class member in the instant litigation, yet continue to dispose of solid waste in Delaware, it would have to pay $ 58.50 per ton, but would not receive the $ 10 per ton rebate under DSWA's differential pricing program. However, without flow control regulation, [*18] all haulers, including smaller ones, would be able to dispose of their waste outside of Delaware.

The testimony at the January 13, 1999 hearing did not show that putative class members will have no choice but to give up their claims in the lawsuit because the alternative would invite economic ruin. At the January 13, 1999 hearing, plaintiffs called William Davidson, President of the Maryland/Delaware Solid Waste Association, officer of Able Recycling, and former President of All-Rite Rubbish Removal d/b/a Metcalf (one of the named plaintiffs). He testified that a small hauler, such as Able Recycling, would have to sign DSWA's contract with the release provision "in order to stay competitive with our competitors." D.I. 50, Tr. 141. Davidson also believes that even without flow control regulations smaller haulers would not necessarily gain an advantage. Smaller haulers would face additional costs in disposing of their waste out of state. The additional costs would be due to driving distance, the possible need to hire additional employees and buy additional trucks, and the disruption of routes. D.I. 50, Tr. 142-44. While nearby, out-of-state disposal facilities exist, such as BFI's American [*19] Ref-Fuel facility in Chester, Pennsylvania, Davidson testified that they are owned by either BFI or Waste Management. D.I. 50, Tr. 143. According to Davidson, a smaller hauler cannot rely on obtaining a competitive rate from their competitors. *Id.* ("I don't think [BFI] would give you a favorable rate at their facility while you were competing with their other part of their company.")

Davidson's testimony clearly does not establish the possibility of coercion. First, Davidson conceded that he did not base his views that smaller haulers would be forced to join the differential pricing program on a specific disposal fee. D.I. 50, Tr. 164 (stating that "I have not sat down and figured that out" in reference to a specific disposal fee). There must exist some disposal fee where smaller haulers would find it economically efficient to dispose of their waste at out-of-state facilities. By not referencing a specific price, Davidson seems to ignore this proposition. [9] For example, Thomas Harvey, Regional Vice President of Waste Management, stated that "currently the small hauler can beat this 48.50 a ton rate. All costs in[] transportation, handling, permitting, licensing, etc., [haulers] [*20] can easily beat the $ 48.50 a ton rate." D.I. 59, App. D-23 (Harvey Dep. at 32). Further, Harvey testified that "probably cost-cost basis, somewhere around 40 to 42 dollars a ton is available to even a small hauler in surrounding jurisdictions." D.I. 50, Tr. 86. Davidson's testimony did not directly address these assertions. Second, Davidson's deposition indicated that he misunderstood the provision dealing with the additional, pro-rata $ 8.50 per ton rebate, as described *supra*. D.I. 67, App. E-13-E-16 [10] (Davidson Dep.). Third, DSWA asserts that Davidson speculated that American Ref-Fuel would not give competitors of BFI, a part owner of the facility, fair treatment, even though Davidson had never used the Ref-Fuel facility. D.I. 50, Tr. 143, 166-67. On the other hand, Harvey essentially testified that the differential pricing plan had several advantages for smaller haulers, including the removal of the possibility that large, vertically integrated companies would drop disposal rates, a guaranteed price, and lower disposal rates out of state. D.I. 59, App. D-20-D-24 (Harvey Dep. at 29-33). The Court holds a clear record of threatened abuses does not exist. *Burrell*, 176 F.R.D. [*21] at 244.

9   However, Davidson did state under cross examination that even if an out-of-state disposal fee is as low as $ 30 per ton, a smaller hauler could not compete against a $ 48.50 per ton rate in state. D.I. 50, Tr. 165.

10   Davidson stated: "If they reach 780,000 tons, is my understanding, from what I remember, they

would get a rebate of $ 10 a ton. And if it exceeded that, then they could get up to 8.50, I believe. That was depending on how many tons they got in over the 780. So that would bring the price down to $ 40 per ton." App. E-13.

## C. BFI and Waste Management

As stated above, both BFI and Waste Management filed objections to the Court's Interim Order and any future Court order limiting communications. The record indicates that BFI and Waste Management are neither coerced nor misled by any communications by DSWA. BFI and Waste Management stated that they have significant knowledge of flow control regulations and considerable experience in litigation involving the validity of such regulations. [*22] Both understand the benefits of such litigation. Both waste haulers are willing to trade the certainty of a favorable settlement with DSWA for the uncertainty of protracted litigation. For example, Waste Management stated that its experience in flow control matters, and the experience of its counsel, will produce a settlement equal to or better than that which may be reached by plaintiffs. BFI and Waste Management apparently viewed the meetings with DSWA as an effort to negotiate a settlement. D.I. 44, Harvey Aff. P 5; D.I. 43, BFI Obj. P 9. Finally, both BFI and Waste Management stated that they would opt out of the class and pursue their own settlement. In short, BFI and Waste Management do not appear to need the protection of the Court.

There remains the contention that DSWA misled the waste haulers. See _Hampton Hardware_, 156 F.R.D. at 632 ("Communications found violative of the principles of _Rule 23_ include misleading communications to the class members concerning the litigation."). DSWA clearly views the release provision as an important term of the proposed differential pricing program. DSWA's expectation of a release of claims was made known at the various meetings between [*23] DSWA and the waste haulers. See D.I. 50, Tr. 71-72 (Vasuki); D.I. 40, Defendant's Pre-Hearing Brief at 9-10 (September 1998 meeting), 10 (October 9, 1998 meeting), 10-11 (November 18, 1998 meeting), 11-12 (November 24, 1998 meeting).

During the week of December 14, 1998, DSWA communicated with certain members of the potential class by sending them copies of the proposed amendments to the regulations and by sending them copies of the "Differential Disposal Fee Program." D.I. 37, App. A-21 (Vasuki Tr. at 132). Plaintiffs complain that the mailing omitted the release provision of the DSWA contract. Plaintiffs assert that this communication was misleading because haulers would not know of the release provision and would be unfairly surprised at a later time. That is true, but plaintiffs are hoisted by their own pe-

tard. Plaintiffs fought for and obtained the Interim Order which foreclosed "DSWA, its officers, employees, attorneys and representatives . . . from any communications with members of the Class concerning their participation in the litigation or relinquishing any rights they may or benefits they might receive under the Actions." The Court finds that DSWA reasonably omitted [*24] the release provision from the mailing in an attempt to comply with the Court's Interim Order, which was in effect at the time of the mailing.

Plaintiffs complain of DSWA's conduct at the November 24 meeting because haulers were not told that they were invited to a meeting to settle their claims. The Court notes that DSWA previously argued that its communications were merely informational and that no offers regarding settlement of the class action or class claims were made. Defendant's Pre-Hearing Brief at 15. Now, however, in its Post-Hearing Brief, DSWA argues that "DSWA has the right to settle claims." Defendant's Post-Hearing Brief at 21.

While the defendant may seek to settle individual claims prior to certification, the putative class members should know the essence of the claim they would be giving up in response to the solicitation of DSWA. Those who sign the DSWA three-year contract may be completely unaware of this litigation and by signing the contract would waive their right to participate in the class action. Some potential plaintiffs may wish to participate in the action and, therefore, should be given the necessary information and opportunity to choose between signing [*25] the contract and participating in the differential pricing program or not participating, but have the right to ship waste out of state. Before any waste hauler signs the release contained in the differential pricing plan, DSWA must give waste haulers adequate notice of the pendency of this action and that by signing the release they forego their right to participate in this litigation. So that waste haulers will have sufficient notice of the pendency of this action, DSWA must prominently notify every waste hauler at the time it sends the differential pricing plan to the waste haulers and at any public meeting where the differential pricing program is discussed. A similar notification should be provided to waste haulers who have already received DSWA's proposed differential pricing plan. This is a reasonable form of notice and correction that does not impinge on DSWA's right to engage in commercial speech.

## IV. CONCLUSION

Based on the reasons set forth above, the Court holds that the plaintiffs have not submitted sufficient evidence to demonstrate that the potential for coercion or confusion is so great as to warrant an interference with DSWA's right to engage in commercial [*26] speech

1999 U.S. Dist. LEXIS 2542, *

with the waste haulers. However, the Court will require DSWA to notify putative class members of the pendency of this action before any putative class member agrees to the release included in the differential pricing contract.

A proposed form of order, including the form of notification, shall be filed with the Court by 12 noon on March 4, 1999. If the parties cannot agree on the proposed form of order, competing forms of order shall be filed by the same date and time.

2 of 3 DOCUMENTS

**CARLO NOVELLA, On His Own Behalf and On Behalf of All Others Similarly Situated, Plaintiffs, - against - EMPIRE STATE CARPENTERS PENSION FUND, as Successor of the WESTCHESTER COUNTY, NEW YORK CARPENTERS' PENSION FUND, and THE BOARD OF TRUSTEES OF THE EMPIRE STATE CARPENTERS' PENSION FUND, as Administrator of the Fund, Defendants.**

05 Civ. 2079 (BSJ) (JCF)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 63540; 42 Employee Benefits Cas. (BNA) 1581*

August 28, 2007, Decided
August 28, 2007, Filed

**PRIOR HISTORY:** *Novella v. Westchester County, 443 F. Supp. 2d 540, 2006 U.S. Dist. LEXIS 52996 (S.D.N.Y., 2006)*

**COUNSEL:** [*1] For Carlo Novella, on his own behalf, Carlo Novella, on behalf of all others similarly situated, Plaintiffs: Edgar Pauk, LEAD ATTORNEY, Law Offices of Edgar Pauk, Esq., New York, NY.

For Empire State Carpenters Pension Fund, as sucessor of the Westchester County, New York Carpenter's Pension Fund, Defendant: Robert Thomas McGovern, LEAD ATTORNEY, Meyer, Suozzi, English & Klein, P.C. (Melvile), Melville, NY.

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JAMES C. FRANCIS IV

**OPINION**

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

The plaintiff, Carlo Novella, sued the Westchester County, New York Carpenters' Pension Fund (the "Fund" or the "Westchester Fund") and its Board of Trustees for refusing to award him the pension to which he claims he was entitled under the Fund's pension plan ("the Plan"). Mr. Novella now moves pursuant to *Rule 15(a) of the Federal Rules of Civil Procedure* to amend his complaint to add certain related claims concerning the calculation of his pension benefits. For the reasons outlined below, the motion to amend is denied.

*Background*

Mr. Novella worked as a carpenter in Westchester County and New York City from 1962 until March 1995. ((Affidavit [*2] of Carlo Novella dated Sept. 18, 2003 ("Novella Aff."), attached as Exh. E to Affirmation of Robert T. McGovern dated April 6, 2007 ("McGovern Aff."), PP 3-4, 6); Complaint, attached as Exh. B to Affirmation of Edgar Pauk dated March 9, 2007 ("Pauk Aff."), P 10). During part of that period, he was a participant in the Fund. [1] Participants in the Fund earn pension credits based on their hours of service in eligible jobs. (Excerpts of Deposition of Patrick Morin ("Morin Dep."), attached as Exh. D to Pauk Aff., at 15-19). Mr. Novella was also a participant in the Westchester County Carpenters Vacation Fund (the "Vacation Fund") and the Westchester County Carpenters Welfare Fund (the "Welfare Fund"). Participating employers were required to pay a set amount to the Vacation Fund and the Welfare Fund for each hour worked by the employee. (Summary Plan Description and Benefit Booklet ("Vacation Plan Summary"), attached as Exh. C to McGovern Aff., P 6(a); Morin Dep. at 55-60). If a participant became ill or was injured outside his place of employment, he would receive a weekly payment from the Welfare Fund. (Morin Dep. at 64-65). Once a year, each participant received a distribution of the [*3] amount contributed in his name to the Vacation Fund. (Vacation Plan Summary, P 6(b); Morin Dep. at 56-57). Money contributed to the Vacation Fund was treated as taxable wages and was subject to withholding of applicable taxes. (Vacation Plan Summary, P 6(a)).

Case 7:07-cv-06664-KMK-GAY    Document 26-6    Filed 02/27/2008    Page 26 of 29

Page 2

2007 U.S. Dist. LEXIS 63540, *; 42 Employee Benefits Cas. (BNA) 1581

1    From 1982 through 1986 Mr. Novella earned no pension credits in the Westchester Fund, as during that period he worked in jobs covered by a different pension plan. (Novella Aff., P 4)

On March 22, 1995, Mr. Novella suffered a disabling accident at work, as a result of which he received workers' compensation benefits. (Complaint, P 10). He began receiving disability pension benefits from the Westchester Fund on October 1, 1995. (Complaint, P 11). On March 19, 2002, Mr. Novella filed suit, alleging that his pension had been miscalculated and that the Fund's pension scheme violated various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. § 1001 et seq.* The plaintiff claimed that the defendants had miscalculated his pension in two ways: (1) by using two different benefit rates, and (2) by failing to award him pension credits for the period during which he collected workers' compensation benefits. [*4] On August 4, 2004, former Chief Judge Michael B. Mukasey granted summary judgment for Mr. Novella on the first claim but held that the plaintiff had failed to exhaust his administrative remedies with regard to the second. [2] *Novella v. Westchester County, New York Carpenters' Pension Fund, No. 02 Civ. 2192, 2004 U.S. Dist. LEXIS 15152, 2004 WL 1752820, at *7 (S.D.N.Y. Aug. 4, 2004)* ("Novella I").

2    Mr. Novella subsequently moved for and was granted class certification with regard to the first claim. *See Novella v. Westchester County, New York Carpenters' Pension Fund, 443 F. Supp. 2d 540 (S.D.N.Y. 2006); Novella v. Westchester County, New York Carpenters' Pension Fund, No. 02 Civ. 2192, 2004 U.S. Dist. LEXIS 26149, 2004 WL 3035405 (S.D.N.Y. Dec. 29, 2004).*

Mr. Novella then applied to the administrators of the Fund for pension credits based on the hours during which he received workers' compensation. (Complaint, P 17). The plan administrators did not act on his request within 90 days. (Complaint, P 22). After thus exhausting his administrative remedies, Mr. Novella filed the instant complaint on February 14, 2005, bringing the same claim that had been dismissed as unexhausted in *Novella I.* (Complaint, PP 23-25). [3] The plaintiff now seeks to amend [*5] that complaint to add a claim that the defendants violated the terms of the Plan by failing to award pension credits for payments that he received from the Vacation and Welfare Funds and that the failure to credit such contributions violates the applicable regulation promulgated by the Department of Labor under of ERISA, *29 C.F.R. § 2530.200b-2.* [4] (Proposed Amended Class Action Complaint, attached as Exh. A to Pauk Decl., PP 14-21).

3    The defendants in this case, the Empire State Carpenters Pension Fund and its trustees, are successors to the Westchester Fund.

4    Although the plaintiff's papers are not entirely clear on this point, the payments received from the Vacation and Welfare Funds would presumably have to be translated into hours worked in order to incorporate them in any credit pension calculation.

*Discussion*

A. *Standard for Amendment*

A motion to amend is governed by *Rule 15(a) of the Federal Rules of Civil Procedure,* which states that leave to amend "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a); see also Oneida Indian Nation of New York v. City of Sherill, 337 F.3d 139, 168 (2d Cir. 2003), rev'd on other grounds, 544 U.S. 197, 125 S. Ct. 1478, 161 L. Ed. 2d 386 (2005).* Notwithstanding the [*6] liberality of the general rule, "it is within the sound discretion of the court whether to grant leave to amend." *John Hancock Mutual Life Insurance Co. v. Amerford International Corp., 22 F.3d 458, 462 (2d Cir. 1994)* (citation omitted); *accord Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 88 (2d Cir. 1998).* In discussing the use of this discretion, the Supreme Court has stated:

> In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave should . . . be freely given.

*Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)* (internal quotation marks omitted).

Here, the defendants maintain that Mr. Novella's motion to amend should be denied because it is futile. A motion to amend is futile if the amendment would not withstand a motion to dismiss pursuant to *Rule 12(b)(6). Oneida Indian Nation, 337 F.3d at 168; Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001); Smith v. CPC Int'l, Inc., 104 F. Supp. 2d 272, 274 (S.D.N.Y. 2000).* [*7] To overcome objections of futility, the moving party must merely show that it has "at least colorable grounds for relief." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 783 (2d Cir. 1984)* (citation omitted); *see also Kaster v.*

*Modification Systems, Inc., 731 F.2d 1014, 1018 (2d Cir. 1984).*

The defendants contend that the plaintiff's motion to amend is futile for four reasons. First, they argue that Mr. Novella failed to exhaust his new claims by presenting them to plan administrators. Second, they maintain that the claim for additional pension credits based on contributions to the Vacation and Welfare Funds has no merit under the applicable provisions of ERISA and relevant case law. Third, the defendants contend that the plaintiff lacks standing to assert these claims. Finally, they assert that the plaintiff's new claims are time-barred. Because the plaintiff failed to exhaust his administrative remedies prior to bringing his motion to amend, I need not reach defendants' other arguments.

## B. *Failure to Exhaust*

It is well-established that a plaintiff must exhaust the administrative remedies available to him before bringing an ERISA claim. *See Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594 (2d Cir. 1993).* [*8] In the ERISA context, this means taking advantage of "those administrative appeals provided for in the relevant plan or policy." *Id.* As noted above, Mr. Novella's original claim relating to workers' compensation payments was initially dismissed for failure to exhaust. *Novella I, 2004 U.S. Dist. LEXIS 15152, 2004 WL 1752820, at *7.* While he has now exhausted that claim, it is uncontested that, prior to bringing the instant motion, Mr. Novella did not present to plan administrators his claims regarding pension credits for Vacation and Welfare Fund payments. (Plaintiff's Reply Memorandum of Law in Support of Motion For Leave to File an Amended Class Action Complaint ("Pl. Reply") at 6-8.) Thus, the defendants argue, those claims would not withstand a motion to dismiss. The plaintiff raises several arguments in response.

First, he points out that the Second Circuit's interpretation of the exhaustion requirement under ERISA has changed since *Novella I* was decided. In *Novella I*, the court stated that "absent a determination by the plan administrator, federal courts are without jurisdiction to adjudicate whether an employee is eligible for benefits under an ERISA plan." *2004 U.S. Dist. LEXIS 15152, 2004 WL 1752820, at *6* (quoting *Peterson v. Continental Casualty Co., 282 F.3d 112, 117 (2d Cir. 2002)).* [*9] But in *Paese v. Hartford Life & Accident Insurance Co., 449 F.3d 435 (2d Cir. 2006)*, the Second Circuit held that "a failure to exhaust ERISA administrative remedies is not jurisdictional, but is an affirmative defense," which therefore must be asserted and established by the defendant. *Id. at 446.* Notwithstanding this finding, the court reiterated that the "federal policy favoring exhaustion of administrative remedies in ERISA cases" is "firmly

established." *Id. at 443.* Thus, *Paese* does not remove the requirement that the plaintiff exhaust his administrative remedies.

Second, the plaintiff argues that exhaustion would be futile in this instance because the defendants have established their unwillingness to grant pension credits for vacation and illness pay. (Pl. Reply at 6-7.) The Second Circuit has held that only a "clear and positive showing that seeking review by [the defendant] would be futile" will" excuse the claimant from exhausting his claim. *Jones v. UNUM Life Insurance Co., 223 F.3d 130, 140 (2d Cir. 2000)* (internal quotation marks and citation omitted); *see also Kennedy, 989 F.2d at 594* ("Where claimants make a 'clear and positive showing' that pursuing available administrative [*10] remedies would be futile, the purposes behind the requirement of exhaustion are no longer served, and thus a court will release the claimant from the requirement." (quoting *Fizer v. Safeway Stores, 586 F.2d 182, 183 (10th Cir. 1978))).*

Here, the plaintiff has made no such "clear and positive showing." Mr. Novella points to testimony by Patrick Morin, a trustee of the Fund, in which Mr. Morin indicated that "an hour of service as defined in the plan . . . means an hour of contributions" (i.e., an hour's worth of contributions by the employer to the pension plan). (Morin Dep. at 20). The plaintiff interprets this to mean that the Fund has taken the position that no pension credits will be awarded based on payments from the Vacation Fund or the Welfare Fund. But such a conclusion is hardly clear from the testimony cited. [5] Mr. Morin did state later in his deposition that the Fund "ha[d] never credited an hour of service for any one of these categories, the holiday, vacation, leave of absence." (Morin Dep. at 52). Even so, such a statement of past practice does not establish futility. Indeed, the exhaustion requirement exists in part to allow plan administrators to review and remedy an [*11] error in its practices. *See Kennedy, 989 F.2d at 594-95* (noting that a primary purpose of the exhaustion requirement is to "uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts" (citation omitted)).

5  Indeed, this section of the deposition reveals that there was significant confusion about the issue being discussed. (Morin Dep. at 21-30).

The plaintiff likens this case to *Paese*, in which administrative exhaustion was deemed futile. But in *Paese*, the plaintiff had received a letter from his insurance company stating that the plan's "claim decision is now final" and informing him that he had "exhausted any administrative remedies available to [him] under the policy." *449 F.3d at 449.* Here the issue has never been directly submitted to plan administrators for determination, and Mr. Morin's ambiguous deposition testimony is not

Case 7:07-cv-06664-KMK-GAY    Document 26-6    Filed 02/27/2008    Page 28 of 29

Page 4

2007 U.S. Dist. LEXIS 63540, *; 42 Employee Benefits Cas. (BNA) 1581

equivalent to such a determination. [6] Accordingly, exhaustion cannot be deemed futile in this case.

6   The plaintiff also points out that in *Paese* the court held that the plan's "decision that Paese was not totally disabled from his 'own occupation' necessarily implies a decision that he was not totally disabled from 'any [*12] occupation.'" *Paese*, 449 F.3d at 449. Therefore, the court reasoned, "any reasonable person in Paese's situation would necessarily conclude that it would have been futile . . . to seek administrative review of his claim [under the] any occupation standard, if his claim had just been denied on the more lenient own occupation standard." *Id.* Here, it is not the case that, as the plaintiff argues, contributions to the Vacation and Welfare Funds are a subset or lesser included category of workers' compensation in the same way that one's "own occupation" is a subset of "any occupation." The two categories at issue in this case are not logically linked, and denial of a claim as to one category does not necessarily imply denial of a claim as to the other.

The other cases cited by Mr. Novella on this issue are inapposite for the same reason. *Dozier v. Sun Life Assurance Co. of Canada*, 466 F.3d 532 (6th Cir. 2006), concerns precisely the same issue as *Paese:* the court ruled that a claimant denied benefits under the "own occupation" standard was not required to exhaust a claim under the "any occupation" standard. *See id.* at 533. In *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647 (7th Cir. 1996), the [*13] Seventh Circuit found that, much as here, "[t]he two claims are not so identical" that the denial of one claim "demonstrates with certainty" that the second claim would also be denied. *Id.* at 650. And in *Cilano v. Alstom Transportation, Inc.*, No. 04-CV-6322, 2005 U.S. Dist. LEXIS 8695, 2005 WL 139172, at *2-3 (W.D.N.Y. Jan. 18, 2005), the court, citing *Lindemann,* found that the two claims were sufficiently identical such that denial of one constituted denial of the other. But this finding was based on the defendants' "agree[ment] that their administrative denials of plaintiff's [first] claim prohibit payment of [plaintiff's second claim]." *Id.* 2005 U.S. Dist. LEXIS 8695, [WL] at *3. Here, there is no such agreement.

Finally, the plaintiff asserts that his claims need not be exhausted because he alleges a violation of 29 C.F.R. § 2530.200b-2. (Pl. Reply Memo at 7-8.) While the Second Circuit has not addressed this question directly, the Third, Fourth, Fifth, Sixth, Ninth, and Tenth Circuits

have held that exhaustion is not a prerequisite to actions alleging that a pension plan violates ERISA's provisions. [7] *See Richards v. FleetBoston Financial Corp.*, 427 F. Supp. 2d 150, 177 (D. Conn. 2006) (collecting cases); *Campanella v. Mason Tenders' District Council Pension Plan*, 299 F. Supp. 2d 274, 281 (S.D.N.Y. 2004) [*14] (collecting cases). Moreover, the Second Circuit has recognized that "[d]istrict courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation." *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 102 (2d Cir. 2005) (quoting *DePace v. Matsushita Electric Corp. of America*, 257 F. Supp. 2d 543, 557-58 (E.D.N.Y. 2003)); *see also Richards*, 427 F. Supp. 2d at 178 (collecting cases). Such courts have reasoned that "although plan fiduciaries may have expertise in interpreting the terms of a particular plan, it is primarily the role of the judiciary to engage in statutory interpretation." *Campanella*, 299 F. Supp. 2d at 281 (citing *DePace*, 257 F. Supp. 2d at 557.)

7   The Eleventh Circuit has held that exhaustion of statutory ERISA claims is necessary, *see Counts v. American General Life and Accident Insurance Co.*, 111 F.3d 105, 109 (11th Cir. 1997), while the Seventh Circuit has held that it is a matter within the discretion of the district court. *See Lindemann*, 79 F.3d at 650.

With respect to claims for specific benefits under the terms of a plan, by contrast, the Second Circuit clearly requires exhaustion. *See Jones*, 223 F.3d at 140; [*15] *Kennedy*, 989 F.2d at 594; *Campanella*, 299 F. Supp. 2d at 281. In the case of such "plan-based" claims, plan administrators can be presumed to have expertise that the judiciary does not, and exhaustion thus serves its intended purposes.

Here, the plaintiff's amended First Claim for Relief asserts that the failure to award pension credits for payments from the Vacation and Welfare Funds is a violation of the terms of the Plan (Proposed Amended Class Action Complaint, PP 14-19), while his amended Second Claim asserts that the defendants' "practice of not crediting participants for their receipt of pay on account of illness and incapacity . . . and vacation" violates 29 C.F.R. § 2530.200b-2. (Proposed Amended Class Action Complaint, PP 20-21). The plaintiff clearly must exhaust his administrative remedies with respect to the first claim. Moreover, since his second claim is predicated upon the plan administrators' interpretation of the Plan's provisions, an award of such credits by the plan administrators after administrative appeal would render it moot as well. Thus, the purposes of exhaustion are served by dismissing both claims to give the plaintiff the opportunity to exhaust them.

2007 U.S. Dist. LEXIS 63540, *; 42 Employee Benefits Cas. (BNA) 1581

*Conclusion*

For  [*16] the reasons set forth above, Mr. Novella's motion for leave to file his proposed amended complaint is denied.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

August 28, 2007